*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*
=================================

|  |  |  |
|---|---|---|
| **CHIFFON DAVIS and INDIA WILLIAMS,** on behalf of themselves and a class of those similarly situated, | : : : : | **Case No.:** 1:18-cv-00459 |
| Plaintiffs | : : | **Judge:** Hon. J. Paul Oetken |
| vs. | : : | **Magistrate:** Hon. Stewart D. Aaron |
| **NEW YORK CITY HOUSING AUTHORITY, OYESHOLA OLATOYE, individually and in her official capacity as Chairperson of the New York City Housing Authority, BILL de BLASIO, individually and in his official capacity as Mayor of the City of New York; and the CITY OF NEW YORK, a municipal Corporation;** | : : : : : : : : | |
| Defendants | : : : | |

=================================

## SECOND AMENDED COMPLAINT

Plaintiffs, Chiffon Davis ("Davis") and India Williams ("Williams," and together, "Plaintiffs"), by and through their undersigned attorneys, individually and on behalf of all others similarly situated, file this Second Amended Complaint against Defendants New York City Housing Authority ("NYCHA"), OYESHOLA OLATOYE ("Olatoye"), who is the former NYCHA Chairperson, in her personal capacity and in her official capacity, Bill de Blasio ("Mayor de Blasio"), who is the Mayor of New York City, in his personal capacity and in his official capacity, and the City of New York, a municipal corporation. Plaintiffs seek relief under

1

federal law for violation of constitutional due process and rights under the Housing Act and its implementing regulations.[1]

1.      Residents of NYCHA public housing are enduring, and have endured for years, a home-heating crisis that has left hundreds of thousands of NYCHA tenants without adequate and reliable heat, and often no heat, in their NYCHA-owned apartments.

2.      The heating crisis was preventable.

3.      Public Advocate Letitia James previously sued NYCHA (on behalf of NYCHA's residents) for its failure to heat the homes of NYCHA tenants.

4.      In March of 2016, in connection with the James lawsuit, NYCHA entered into a settlement agreement promising that it would take action to provide adequate heat.

5.      But rather than take action, NYCHA and Defendants have actively engaged in a cover-up of their failure to provide heat to Plaintiffs and class members and affirmatively placed Plaintiffs and class members in danger of being exposed to freezing temperatures for years.

6.      Indeed, the deliberate indifference is, and has been, so entrenched in NYCHA that its former chairperson, Defendant Olatoye, has been "cooking the books" on heating complaints by closing them as "resolved" without actually restoring heat to the units in question.

7.      This is consistent with NYCHA's custom, policy, and practice to engage in a "code of silence" regarding its unsafe and inhabitable housing conditions – the most recent manifestation of which was Olatoye's misrepresentations to HUD about lead paint inspections.

---

[1]      Plaintiff Davis' claims under the Housing Act were previously dismissed pursuant to Rule 12(b)(6). The allegations remain herein only to preserve that issue for appeal, should one ever occur.

8.     Defendants, and each of them, knew (or should have known in the absence of reckless disregard) that the customs, policies, and practices alleged herein would lead to the present heating-crisis emergency.

9.     When a municipal actor systematically deprives citizens of their rights under the Constitution and federal law, and when the State institutions have found themselves unwilling or unable to protect these rights, the federal courts are required to step in.

10.    This case is brought in order to allow this Court to intervene and address the deepening NYCHA home heating crisis, to hold New York City's public officials to account, and restore heat to the homes of at least 320,000 NYCHA residents enduring record-cold winter seasons.

## Jurisdiction and Venue

11.    This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding Plaintiffs' rights under 42 U.S.C. § 1983. The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367, because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

12.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

**Parties**

13.     Plaintiffs are all citizens of the State of New York.

14.     Defendant NYCHA is a public housing agency in the City of New York, which provides subsidized housing to low-income residents throughout the city. Over half-a million New York City citizens live in one of over 2,600 NYCHA buildings.

15.     NYCHA receives federal funding from the United States Department of Housing and Urban Development ("HUD").

16.     Defendant Olatoye is a New York resident and is sued individually and in her official capacity as former NYCHA chairperson, for both her own conduct and for the conduct of NYCHA.

17.     Defendant Mayor de Blasio is a citizen of the State of New York, is sued individually and in his official capacity, and has been the Mayor of the City of New York since January 1, 2014.

18.     In his role, Mayor de Blasio has been the individual ultimately responsible for establishing and enforcing New York City executive policies, practices, and procedures, including those policies, practices, and procedures relating to the oversight of Defendant NYCHA. As alleged herein, Mayor de Blasio himself has stated that running NYCHA is a "mayoral responsibility" and stated "I consider myself ultimately responsible for what we do at NYCHA."

19.     As the City's chief executive, policies, practices, and procedures established or enforced by Mayor de Blasio with respect to the operation of city-affiliated agencies, such as NYCHA, are New York City policies, practices, and procedures.

20.     Defendant, THE CITY OF NEW YORK ("The City") is a municipal corporation organized pursuant to New York State law and governs the largest city in the United States by population.

21.     Plaintiffs all live in apartments in the NYCHA-owned and operated public-housing developments in New York City, as follows:

      a.   Plaintiff Davis lives in the Morissania Air Rights Development in the Bronx, New York.

      b.   Plaintiff Williams lives in the NYCHA development at 797 Hicks Street in Brooklyn, New York.

22.     Plaintiffs have been without adequate or reliable heat in their apartments on numerous occasions, sometimes for weeks (or months), as New York suffered multiple "arctic blasts" of freezing temperatures, especially during the winters in 2016-2017 and 2017-2018.

23.     During winter periods of below-freezing outdoor temperatures, the temperature in Plaintiffs' apartments seldom exceeded 50 degrees and was often freezing or below freezing.

24.     Due to these cold temperatures, Plaintiffs were often left no recourse but to sleep in heavy winter clothing, shower less frequently, and endure extreme discomfort. The stories of Plaintiffs are all exceedingly similar, expressing common and typical timeframes, actions, and damages. The heat-related stories spread of record in conjunction with the consent decree consideration, underscore the pervasive, common, and typical nature of the stories.

25.     For instance, Ms. Davis was left without heat before, during, and after the deadly winter storms that occurred on March 2 and March 7, 2018, as temperatures outside dropped to well below freezing, and she estimated the temperature inside her apartment to be approximately 40 degrees Fahrenheit.

26.     Plaintiff Williams was regularly left without heat or hot water as well.

27.     The Plaintiffs have all been deprived of their right to bodily integrity and property rights by the same policy, practice, or custom of the Defendants, namely the active concealment of systemic disfunction and the pervasive code of silence manifesting deliberate indifference to the Plaintiffs' constitutional rights.

28.     Plaintiffs have repeatedly informed NYCHA about the lack of adequate heat in their apartments.

29.     This last winter was not the first in which the residences of Plaintiffs and class members have not been adequately heated; similar failures have occurred during each of the past several winters.

30.     To date, and throughout the class period, NYCHA has not made reasonable efforts to repair or replace the heating system or otherwise ensure the temperature in Plaintiffs' apartments remain above minimum standards of habitability.

31.     Indeed, NYCHA's response to complaints about heating failures has been so lacking that Plaintiffs and class members have often been chilled from even making such requests.

32.     As a result, Plaintiffs, their neighbors, and hundreds of thousands of class members have suffered physical discomfort, emotional distress, increased illness, and decreased hygiene, as well as deprivation of rent paid for living conditions that do not meet minimum standards of habitability.

33.     For years, NYCHA public-housing residents have suffered through brutal winters without heat in their homes.

34.    Each NYCHA development is located within New York City, an area of approximately 468 square miles, across which outdoor temperatures are typically consistent within a few degrees.

35.    Outdoor temperatures during the winter months in the New York City area routinely dip below freezing, often for multiple weeks at a time

36.    Plaintiffs have been without adequate heat for multiple winters, along with thousands of other NYCHA residents in nearby areas.

37.    News of this crisis has been widely reported in the media.

38.    NYCHA was previously the subject of home-heating litigation, ending in an agreement by NYCHA to maintain adequate heating standards and retrain employees.

39.    According to a press release from former New York City Public Advocate Letitia James, published on March 29th, 2016.

> For too long, New Yorkers in our public housing have been denied access to safe, decent and warm homes, [...]. Because of our settlement, NYCHA will no longer be able to deny tenants heat when the temperature outside is well below freezing. Today is a major win for public housing residents as we remain steadfast in our fight to ensure that every New Yorker has fair and decent housing.

The terms of the settlement required in part that: From October 1st through May 31st between 6:00am and 10:00pm the inside of buildings must be heated to at least 68 degrees Fahrenheit when the outside temperature is below 55 degrees, and that between 10:00 pm and 6:00am the inside of the buildings must be heated to at least 55 degrees when the outside temperature is below 40 degrees.

40.    But NYCHA has failed to live up to the settlement agreement, and a new home-heating crisis emerged the very next winter after the expiration of the James agreement.

41.     Indeed, news reports of thousands of New York City public housing residents without adequate heat dominated local headlines throughout the 2017-2018 winter.

42.     For instance, an article published in the *New York Daily News* on December 29th, 2017 reported:

> Home is where the heat is- but apparently not for a number of New Yorkers in public housing. As frigid temperatures continue to grip the city, the city Public Advocate's office says its received some 30 complaints from New York City Housing Authority residents saying they're without heat. The office says it's logged complaints over the past week and a half from 11 complexes in the Bronx, Brooklyn and Manhattan. The complaints came from buildings including the Sotomayor Houses in the Bronx, the Marcy Houses in Brooklyn and the Alfred E. Smith Houses in Manhattan. A NYCHA spokeswoman,… Jasmine Blake noted a $17 billion capital deficit means many of the boilers, which are 'well past their life expectancy,' are not being replaced.

43.     The *New York Post* reported, "Some NYCHA complexes still without heat after 'bomb cyclone,'" on January 5th, 2018, and stated:

> A day after residents of a Queens public-housing complex had to endure the "bomb cyclone" with little or no heat, the heat was reported out at several other developments. Buildings at six complexes in Manhattan, Brooklyn, the Bronx and Staten Island had open heat work orders by Friday afternoon, according to NYCHA spokeswoman Jasmine Blake. The Office of Public Advocate Letitia James had complaints of heat and/or hot water being off another 12 NYCHA developments. On Thursday at the sprawling NYCHA run Woodside Houses, residents of 1,300 apartments had no heat or hot water for at least part of the storm. Some endangered themselves by cranking up their ovens and stoves as a source of heat to stay warm…. The mayor admitted: "the infrastructure of NYCHA is in very tough shape."

44.     According to an ABC 7 article published on January 6th, 2018:

> It is beyond unbearable and inhumane to not have heat in sub-zero temperatures, but NYCHA residents across the city say they have been suffering through the cold snap with no relief in sight. It is a heating crisis that NYC comptroller Scott Stringer says his office first identified in 2015, and it has since gotten worse with NYCHA boilers five times more defective than the citywide average. 'If you live in NYCHA there's a 40 percent chance you're in a building with a defective boiler, but for people who don't live in NYCHA it's just seven percent. This is discrimination, this is outrageous and enough is enough,' said Stringer.

45.     On January 10th, 2018, an article in the *New York Post* entitled "City Council members demand de Blasio address failing NYCHA heating" stated:

> Forty fired-up City Council members have signed a letter demanding Mayor de Blasio 'finally' address the New York City Housing Authority's failing heating systems. Bronx Councilman Ritchie Torres, the letter's author, slammed de Blasio for not sufficiently addressing what he described as a 'humanitarian crisis' — shivering tenants at numerous NYCHA buildings lacking heat.

### Challenged Policies or Practices

46.     The above-referenced heating crisis is and was the inevitable result of certain policies and practices, described below, and implemented by Defendants over the months and years leading up to the current debacle.

47.     There was a deluge of facts—indeed, even NYCHA's admissions—supporting the allegations herein revealed on February 6, 2018, when several NYCHA representatives, including, without limitation, Defendant Olatoye, testified under oath before the New York City Council Committee on Oversight and Investigations, jointly with the Committee on Public Housing, the transcript of which is fully incorporated by reference herein and attached as Exhibit A ("Ex. A") ("NYC Council Test. Tr.").

48.     The council members were irate about NYCHA's failures to provide heat to the residents, based, in part, on their review of factual findings.

49.     NYCHA representatives, including, without limitation, Defendant Olatoye, could not back out of admitting to the unlawful failures in proving heat to residents.

50.     For example, Defendant Olatoye admitted to NYCHA's heating failures:

> Well Mr. Speaker, one; I have, from… at the outset of my testimony today acknowledged the residents and their stories and sharing that and specifically said that the performance and the interruptions in service were unacceptable[.]

> NYC Council Test. Tr., 52:23-53:4.

51.     For example, Co-Chairperson Alicka Ampry-Samuel ("Co-Chair Ampry-Samuel") stated the following, in relevant part:

> Right now nothing epitomizes that divide better than NYCHA's failure to provide heat and hot water to residents; it's one of their most basic responsibilities, but lately we're hearing again and again that that isn't what's happening; they get notices that their service is restored, but there's still no heat. They hear that NYCHA is resolving complaints in hours, but there's still no heat. The NYCHA residents here today already know how big of a problem this heating situation is, but I'm not sure how many people outside of NYCHA fully understand the magnitude of what's happening here. So what I want to make sure and what I want to make everyone understand just as importantly; I want to make sure the formal record reflects it. We owe that to the residents. We owe it to them to find out what's going wrong at NYCHA.
>
> So let's start with the numbers. On Thursday, NYCHA informed the Committee that over 320,000 residents have experienced a heat or hot water outage this heating season, 320,000 residents; that's an enormous number. But to give it a real sense of scale, remember that there are only 390,000 housing residents anyway, so that means more than 80% of NYCHA residents have been without heat or hot water and we're only halfway through the heating season. That is not just a moral failure; that is a legal failure. [clapping] Imagine if we found out… [background comment] Imagine if we found out a private landlord wasn't providing heat to 80% of their residents; imagine what we would all be saying right now; we wouldn't just be talking about doing better or gee, we messed up; we'd be talking about punishment, we'd be talking about fines and frankly, we'd be talking about jail. …
>
> So today I want to get to the bottom of this; why NYCHA is not living up to the basic promise of providing residents with a livable home. I don't want to hear about the new policies you're changing at the top; I want to know why you're failing the residents. How about we get to that point, where residents are constantly being left in the dark, why they can't trust a thing they're told and why no one at NYCHA seems to be truly listening. Well I'm here to listen and I'm here to make sure there is accountability, from the Chair of NYCHA, all the way down to every development and every building manager; from the general manager to the boiler repair team.
>
> NYC Council Test. Tr., 7:12-9:11.
>
>                                        ***
>
> [Co-Chair Ampry-Samuel]: So when we started off with the residents speaking first and the conversation was about residents not being heard and tickets being closed prematurely, and now when we're delving into the fact that the databases and systems are not necessarily working with each other or are not adequately being

tracked, it goes back to the residents and what they actually said, that they are living in apartments that did not have any heat and hot water, but yet we had comments that stated they were closed within 24 hours or they were closed within 48 hours, but there were some samplings that were made, there were some random apartments that were checked, there were robocalls, and that's just all… it… it… it just feels like excuses, so we just wanna turn it back to the fact that the residents have been saying over and over again that they have not been heard and the services are not there, and so we just want the record to reflect that; that you already admitted that you're making some changes; there are plans in place, but the residents have stated it from the beginning, so I just wanna just reiterate that, and then we're gonna move on to our questions from our colleagues, but first we will hear from our Public Advocate Letitia James…

NYC Council Test. Tr., 117:18-118:18.

52.     Likewise, Co-Chairperson Ritchie J. Torres ("Co-Chair Torres") stated the following, in relevant part:

The crisis confronting NYCHA stems not only from deep disinvestment, which is as staggering as it is scandalous; it also stems from deep dysfunction in the very management structure of the New York City Housing Authority. NYCHA has a chairperson [Defendant Olatoye] whose credibility has sustained irreparable damage; she has knowingly filed a false certification with the federal government; she has submitted false testimony to the City Council, not on one but two occasions, on a matter of public health; she has haplessly presided over a humanitarian crisis where hundreds of thousands of residents were living at various points without heat and hot water. NYCHA, for two and a half years, had a general manager who was utterly ineffective, who by all accounts had no handle on the day to day operations of the Housing Authority.

What NYCHA faces is not only a crisis of dollars and cents or systems and structures; what NYCHA faces is a crisis of leadership. The Administration and NYCHA can rightly fault the federal government for defunding public housing, which historically has been a federal obligation, but it cannot fault the federal government for the people it hires and the people it fails to hold accountable; that failure is entirely their own. The lack of accountable and transparent leadership of NYCHA can be seen in the Authority's public mishandling of the heating crisis.

In an attempt to downplay the heating outages in public housing, a spokesperson for the Housing Authority declared in early January, after the worst of the cold spell, that 97% of NYCHA apartments had consistent heat. The 97% statistic is not only out of touch with the on-the-ground observations of every resident and elected official in the City of New York; that statistic has no basis in the data that we have seen.

11

According to our own investigative findings, a staggering 323,000 resident in public housing lost heat and hot water. The number of heating outages went from 1,060 in 2016 to 2,395 in 2017, a 76% increase. The number of hot water outages went from 916 in 2016 to 4,112 in 2017, a 348% increase.

NYC Council Test. Tr., 11:5-12:25.

53. Speaker Corey Johnson ("Speaker Johnson") also expressed concern about the lack of accountability for NYCHA:

[Speaker Johnson]: Okay. How many heating-related violations has HPD or any other agency issued against NYCHA during this last heating season? And the answer's none because HPD doesn't oversee NYCHA; is that right? HPD has no enforcement capability with NYCHA; is that right?

[Defendant Olatoye]: That is correct.

[Speaker Johnson]: Okay. When a private landlord receives a heating-related violation, the landlord cannot have the violation cleared until they file a Certificate of Correction with HPD. How many Certificates of Correction related to heat issues has NYCHA filed with HPD during the heating season? I assume the answer's none. The point I'm getting at is; NYCHA cannot be the fox guarding the henhouse. There needs to be someone who is doing enforcement on NYCHA besides NYCHA doing enforcement on their self, [clapping, background comments] that's the point here, [background comment] because if we have 80% of apartments without heat; if we have 320,000 individuals without heat during the heating season; if two-thirds of those loss of heating complaints and records date before the bomb cyclone but happened from October to the beginning of January, there is a problem here and I don't have the trust today that NYCHA is in the position to be able to fix this on its own. So the point I'm making is; I know Edna is there now to do compliance, which is great, and she has done tremendous service to our city over the years and I'm very grateful that she agreed to this thankless, difficult job and I hope that her work on compliance will hopefully fix some of these issues.

NYC Council Test. Tr., 106:23-108:6.

54. In response to Co-Chair Ampry-Amuel's questioning, Cathy Pennington ("Pennington"), then NYCHA's executive vice president of Housing Operations, admitted to the heating failures:

[Co-Chair Ampry-Amuel]: So the first question, just dealing with the scope of the heating outages, NYCHA has informed the Committees that as of January 22nd, the number of public housing residents who have experienced a heating outage

during this heating season was 323,098 residents. Frankly, that is a staggering number. Can you please confirm that number for the record and what is the current number? In other words, as of today, how many residents have experienced a heating outage this heating season? … Please.

[Pennington]:  Good morning; it's Cathy Pennington, Acting EVP for Housing Operations. And the number that you've quoted of 323,098 household members who have been affected is accurate and that heating season that we're speaking of begins October 1st, this data was October 1, 2017 through January 22, 2018; it involved 143,000 units that did have heat outages during that time period.

During this heating season, the average duration of the heat outage was 48 hours; this compares to an average duration of 34 hours for heat outages during the last heating season. So again, we saw a huge increase in the duration of the outages due to the extreme cold spell which compromised our aging infrastructure.

During this heating season, the average duration of hot water outage was 52 hours; this compares to an average duration of 27 hours for hot water outages during the last heating season.

*** 

[Co-Chair Ampry-Samuel]:  So on average some of the families were without heat for two full days; is that correct?

[Pennington]:  That's correct.

NYC Council Test. Tr., 48:18-49:23; 50:12-15.

*** 

[Pennington]:  Okay. So on average… this heating season, the average outage is 48 hours.

[Co-Chair Torres]: 48 hours?

[Pennington]:  Right. We saw it drop, when we opened our situation room, down to 16 hours.

NYC Council Test. Tr., 69:3-8.

55.    Public Advocate Letitia James also expressed her concern:

Let me just say this really is a humanitarian crisis and it really is astonishing at the lack of information from the leaders her at NYCHA. So between the lead inspection debacle in today's revelations about heating, it is more clear to me now more than

13

ever that NYCHA is fundamentally broken to its core and that the vast majority of low-income individuals who reside at NYCHA unfortunately are struggling and suffering and it's just inexcusable.

NYC Council Test. Tr., 118:23-119:8.

56.     Furthermore, Mayor de Blasio took personal responsibility for NYCHA in a speech he gave on February 8, 2014, stating:

> a.   "We're responsible – we are responsible – for the health and safety when it comes to every one of these tenants. …"
> b.   "The buck stops at City Hall from now on when it comes to NYCHA…"
> c.   "I consider myself ultimately responsible for what we do at NYCHA… This is a mayoral responsibility." [2]

57.     In the 2/8/14 speech, after telling people that Defendant Olatoye's name means "God's Great Gift," Mayor de Blasio stated that Defendant Olatoye would take massive steps forward on energy efficiency and retrofitting units. He also promised Defendant Olatoye would be responsible for the "human repairs" needed in restoring trust. *See*, https://www1.nyc.gov/office-of-the-mayor/news/971-14/transcript-mayor-de-blasio-appoints-leadership-major-housing-agencies-promising-take-new.

### A.   Insufficient Staffing

58.     Defendants have consistently maintained boiler maintenance staffing at levels that are woefully insufficient to meet seasonal emergency repair demand.

59.     Specifically, despite the NYCHA heating scandal (growing in severity over the past several years), and despite the previously-mentioned 2016 James lawsuit (and settlement agreement), NYCHA's boiler maintenance staff has significantly decreased over that period.

---

[2]     These statements, and the rest of the Mayor's speech about NYCHA can be found at: https://www1.nyc.gov/office-of-the-mayor/news/971-14/transcript-mayor-de-blasio-appoints-leadership-major-housing-agencies-promising-take-new, which is incorporated by reference into this complaint.

60.     Indeed, in October of 2017, Defendant Olatoye presided over the reassignment of more than 100 boiler-maintenance staff to other positions without replacement.

61.     As a result of these staffing practices, NYCHA has not responded to emergency heating repair requests, including those made by Plaintiff, for weeks – leaving NYCHA residents to fend for themselves.

62.     Indeed, NYCHA has admitted the role of its chronic boiler technician understaffing in causing the present crisis in statements made to news media and in hearings before the City Council.

63.     Moreover, the avoidable and foreseeable staffing shortage has also prevented NYCHA from making repairs and replacements during summer months, when substantial maintenance work on heating systems is meant to be done, leading to a backlog of needed repairs that NYCHA now claims to be unable to afford.

64.     During testimony on February 6, 2018, New York City Council members and NYCHA representatives, including, without limitation, Kerry Jew ("Jew") (then NYCHA's Executive Vice President and Chief Administration Officer), discussed the woefully inadequate staffing that NYCHA devoted to the heating issues.

65.     For example, Jew stated as follows:

[Co-Chair Torres]: So you went from 391 to 248?

[Jew]: Correct.

[Co-Chair Torres]: So you lost nearly a third of your boiler technicians?

[Jew]: Correct.

66.     Pennington also testified about personnel power to address boilers:

[Co-Chair Torres]: …What plan do you have in place? I don't think that's an answer to my question. Are you telling me you don't have a plan for how to maintain your boilers or…?

[Pennington]:  No, part of the… part of the plan with bringing the vendor in, if I may add to this, is that we recognize that we need more staff to properly service the boilers. This issue of a constant turn in the Heating Plant Technician job, as we analyzed it in the past year, was a problem that we identified, so by bringing in a third-party vendor and being able to transfer approximately 59 developments over to third-party, we're not reducing our staff; that then enables us to reassign our staff to our existing boiler plants and actually increase the number of staff per plant. So today we recognize that we have staff, a typical Heating Plant Technician is servicing four plants; that is not industry standard [sic]…

[Co-Chair Torres]: What's the average in the private industry?

[Pennington]: About 1.5. When we…[interpose]

[Co-Chair Torres]: So they're serving three more boilers than what is normal…? …

[Pennington]: Yes. Yes. And so as we saw the disproportionate staffing to heating plants, along with a constant turn of this particular job title, we then devised a strategy to request proposals for vendors and we identified some portfolio that we could then bring in third-party management. Now this won't be… this isn't this season; it's next season[.]

NYC Council Test. Tr., 99:20-101:6.

67.      Questioning and answers between New York City Council Member Mark Treyger

("Council Member Treyger") and NYCH Representatives, including, without limitation,

Defendant Olatoye and Deborah Goddard ("Goddard," then NYCHA's Executive Vice

President, Capital Projects) further demonstrated NYCHA's insufficient staffing:

[Council Member Treyger]: … Chair Olatoye, do you recall a historic February 2014 Council hearing at Carey Gardens in Coney Island, co-chaired by my colleague Ritchie Torres and myself?

***

[Defendant Olatoye]: I believe it was the pace of the Sandy recovery was ultimately the issue…

16

[Council Member Treyger]: The impetus for the hearing were boilers. Do you recall a March 2015 press conference that you attended with Mayor de Blasio in Red Hook announcing a $3 billion FEMA grant to repair Sandy-damaged developments?

[Defendant Olatoye]: I don't recall the specific press conference, but I do know that that is a resource commitment from FEMA.

[Council Member Treyger]: Today is February 6, 2018; do all of my Sandy-damaged NYCHA developments have permanent boilers functioning today?

[Goddard]: No, they do not…

[Council Member Treyger]: That… That's all I needed to hear. Uh you testified…

[Goddard]: And if I may, they do…

[Council Memer Treyger]: that funding shortages are the main source of chronic heating problems; is that correct?

[Defendant Olatoye]: I believe we've talked about a number of things; funding…

[Council Memer Treyger]: But is funding shortage the main source of chronic heating problems…?

[Defendant Olatoye]: It is absolutely one of the primary reasons.

[Council Memer Treyger]: Okay. So it's been over five years since Sandy, with close to $3 billion and we still have developments with temporary boilers where residents do not have regulated heat -- either too hot or too cold. … So why should we have confidence in NYCHA to resolve heating problems with adequate funding when the record says otherwise? …

[Goddard]: So let's just be also clear that the agreement [bell] with FEMA for the money was 2015, so it's not been three years yet that we have been working with the $3 billion. To your point, we are going into all construction this year; we are making progress on our heaters. I do wanna point out that there have been some problems early on with our temporary boilers; they performed without going down during the season today. When Redfern went down, it was not the temporary boiler; we fixed the problem outside of that plant…

[Council Memer Treyger]: Respectfully, respectfully, the stories that I heard by the residents today were the same stories that I witnessed with my own two eyes years ago, when I went door to door in Carey Gardens and O'Dwyer Gardens and Surfside in my district where I saw residents with their children wrapped in blankets sitting by an open oven, which is a carbon monoxide danger, and I testified at that hearing

in Carey Gardens that I never wanna see that again, and today we continue to deal with the same problems, … with billions of dollars. So it's not just a money issue; it is a management of money issue, or a mismanagement of money. [background comments, clapping] Now as you have noted, these are violations in laws and rules; has there been a discussion about a rent rollback for the residents who have been subjected … to the loss of heat? …

[Defendant Olatoye]: So we have not and do not plan to [bell] change… [crosstalk]

[Council Memer Treyger]: Chair…

[Defendant Olatoye]: Well do you wanna hear…

[Council Memer Treyger]: they have not been getting the services which they are legally required to receive; NYCHA, at minimum, at minimum owes them a rent rollback or rent reduction for the services that they have not been given. [background comments, clapping]

[Co-Chair Ampry-Samuel: No hand clapping, please, please, please… [crosstalk]

[Council Memer Treyger] … And secondly, we heard from the Speaker and both Chairs about the need, and I think you have agreed, that there is a need to hire additional folks to deal with the heating problems; at minimum, I think that there should be a waiver of the DCAS exam fee for NYCHA residents, because you have people with the skills and the qualifications and the interest to work in the very developments which they live in. And I'll ask the last question. You've noted that the Deputy Mayor Alicia Glen oversees the NYCHA portfolio; during the recent bomb cyclone deep freeze period, did she accompany you to any of the impacted developments during that deep freeze period? …

[Defendant Olatoye]: No, she did not.

[Council Memer Treyger]: No, she did not. So let me just say this; we are dealing with a crisis in NYCHA, a crisis in confidence and if we are to be honest about their problems, we all need to honest about that problem, and we are committed in this Council to make sure that NYCHA gets the funding that it deserves, but we need confidence that you will use the money the right way to help the residents [clapping] that we all serve.

NYC Council Test. Tr., 146:7-151:7.

**B.      *"Code-of-silence" cover up***

68.      Defendants Olatoye, NYCHA, Mayor de Blasio and the City of New York maintain a policy, practice, or custom of prematurely closing heating-maintenance-request tickets in order to create the appearance that Defendants are far more responsive to such emergency requests than they actually are (and were), obscuring the full extent of the crisis from the public and lawmakers, while refusing to actually respond to such requests, including, on information and belief, requests made by Plaintiffs and class members.

69.      Specifically, on information and belief, Defendant Olatoye and NYCHA -- with the knowledge, approval and ratification of Defendants Mayor de Blasio and the City of New York -- instructed NYCHA employees to mark heating-maintenance request tickets as closed within hours of being opened. They further instructed that the tickets be closed with a notation that heat was restored, when in fact heat was not restored (and, in truth, no effort was made to address the complaint). This deprives NYCHA residents like Plaintiffs, and class members, of the actual repair services they require and the bodily integrity guaranteed to them under the Constitution.

70.      NYCHA under Defendant Olatoye and with the knowledge, approval, and ratification of Defendants Mayor de Blasio and the City of New York, has a history of falsifying such records. Just last year, Defendant Olatoye was accused of knowingly giving federal authorities fabricated records of mandatory lead inspections, when no such inspections took place, in a scheme some have suggested warrants criminal prosecution.

71.      The City of New York has ratified this policy, practice, or custom through public statements on the heating crisis, in which, for instance Defendant Mayor de Blasio lauds

NYCHA for the reported (fraudulent) hours-long repair turnaround time and misrepresents the agency's responsiveness to heating-repair requests.

72.     NYCHA's repair turnaround time figures are inaccurate and unreliable due to its policy, practice, or custom of prematurely closing repair tickets and its code of silence and cover-up, which is its custom and policy under Defendants Olatoye, Mayor de Blasio, and the City of New York.

73.     NYCHA's "Code-of-Silence" cover up is further demonstrated by its very own admissions made in the Consent Decree it agreed to with the United States, filed on June 11, 2018, with the U.S. District Court for the Southern District of New York.  Consent Decree, *U.S.A. v. New York City Housing Authority*, No. 1:18-cv-05213 (Exhibit B) (S.D.N.Y.) ("Consent Decree").  Although the Consent Decree was not approved by the Court (primarily on legal grounds regarding separation of powers), NYCHA made the admissions contained therein.

74.     NYCHA admitted that residents called in roughly 825,000 insufficient-heat complaints between 2011 and 2016 (Exh. B, pg. 2).  In the Winter 2017-2018 alone, NYCHA admitted that more than 320,000 residents—80% of the public-housing population—lost heat (Exh. B, pg.3)

75.     Several NYCHA representatives, including, without limitation, Defendant Olatoye, testified in response to scathing questions from New York City Council members on February 6, 2018, about the very issues of a lack of transparency in dealing with heating issues.

76.     For example, in response to questioning, Defendant Olatoye stated the following, in relevant part:

> [Co-Chair Torres]: So I have a few questions. So I have been troubled by the Housing Authority's lack of transparency. The Chairperson, as well as your spokesperson, have publicly said that 97% of NYCHA apartments have had consistent heat and hot water, giving the impression that there is no crisis; that's

what those numbers tell me. And then when I find out that 323,000 residents at one point had no heat and hot water -- What are the number of units in your portfolio?

[Pennington]: 175,000.

[Co-Chair Torres]: And out of 175,000, how many of those units did not have heat and hot water at one point?

[Pennington]: 143,000.

[Co-Chair Torres]: 143,000 out of 175,000. And so my question to you is; in the interest of full transparency, why did NYCHA not share those numbers with the general public? Why do we have to wait for a… 'cause I had no idea that… that 323,000 residents in public housing had no heat and hot water; I had no idea that nearly every unit in public housing at one point had a heating and hot water outage. Why do we have to wait for a City Council hearing for NYCHA to be forthcoming with the public about the true nature of its heating crisis?

[background comments, clapping]

[Defendant Olatoye]:  So first I'll say, you know we are still in the middle of heating season, one, and one of the important developments is our establishment of a compliance department to really understand and analyze our data for a level of precision and accuracy. I think it's also important to note, in terms of context, while -- and I think I will say this again -- the interruption of service for any of our residents, but certainly of that scale, is unacceptable, and there were certainly some outliers; I visited some of those outliers myself, Patterson being one of them, where residents did suffer -- with Council Member Ayala [sic]; we were together -- did suffer from prolonged outages and that was incredibly regrettable and we are working, with these recent resources, to quickly replace the mobile boilers there so that we can guarantee a level of service. But I think it's real important that we are… to state that, one, we really wanna be precise with our numbers; we really wanna understand the length of time; we want to understand the impact of the potential outages, and that's what we're working to do, and these resources that the Mayor and hopefully eventually the Council will support will help us do that so that our 400,000 residents do not have to suffer through another spell like this. So agreeing and conceding the point that our data **[inaudible]** evolving and we are working to ensure  that it is more precise and that we can deliver a better level of service to our residents.

[Co-Chair Torres]: May I… At what point did it come to your attention that nearly every unit in your portfolio at one point had no heat and hot water and that 323,000 residents at one point had no heat and hot water; at what point did those sobering statistics come to your attention?

[Defendant Olatoye]: We monitor… I monitor the daily outage report and we can see on a regular basis the numbers of units that are affected, so this is an ongoing and regular level of communication. Again, I think we need to get more precise on our data, but absolutely understand the depth of and the number of families affected by this heating crisis.

[Co-Chair Torres]:  Do you track the length of heat and hot water outages?

[Defendant Olatoye]: We do.

[Pennington]: Yes.

NYC Council Test. Tr., 65:17-68:20.

77.    Others at NYCHA were also forced to testify about the cover-up:

[Co-Chair Torres]:  Now I wanna continue some of the line of questioning of Chairperson Ampry-Samuel. You know one of the most commonly heard criticisms about NYCHA is that the Housing Authority has a pattern of closing complaints without solving them, right; it's been said that you will close work orders for particular apartments without inspecting those apartments or without otherwise verifying whether those apartments in fact have seen a restoration of heat and hot water. Is this accurate?

NYC Council Test. Tr., 71:5-15.

***

[Pennington]:  Yeah. Well this whole issue of how service tickets get closed is at the top of the agenda for us to look at and to figure out what are some better, more effective ways to ensure that the services have been delivered, so your suggestion is welcomed and we are putting it on our list for consideration.

[Co-Chair Torres]: And my concern is; when you repair the boiler and then immediately close the work order, the assumption is that the boiler was the cause of heating loss, but you and I know there are causes beyond boiler failure of heating loss; there could be problems with the piping, problems with the radiator, problems with the insulation in the apartment, so even though the boiler is fixed, it seems odd to me that we would close complaints without actually verifying them.

Now a few… my understanding is that a few thousand units are equipped with sensors that can tell you the temperature in an apartment; is that correct?

[Pennington]: Correct.

22

[Co-Chair Torres]: So suppose you -- and one of those developments, as I understand, is Monterey Houses; suppose you repair the boiler at Monterey Houses, you then immediately close all the heat and hot water complaints at that development; is that correct?

[Pennington]: If it was an outage, yes.

NYC Council Test. Tr., 73:14-74:19.

\*\*\*

[Co-Chair Torres]: So if I repair the boiler at Monterey Houses and then I close all the work orders in Monterey Houses and then I realize in my database, wait a minute, the temperature in Apartment 2E in that development is not up to code; why not analyze the indoor temperature first before deciding whether to close the work order? … You don't have to inspect apartments; all you have to do is look it up in a database.

[Javier Almodovar, then NYCHA's Deputy Director of Heating Services]: It's certainly a good suggestion and one that we will take back.

[Co-Chair Torres]: A good sugge…like wha… the point of a sensor, the point of remotely monitoring the temperature of a unit is to spare you the need to conduct an in-person inspection, so if you're not gonna use that technology to determine the status of a work order, what's the point of the technology? … It just seems like NYCHA's approach is a rejection of common sense. I would review the temperature reading first and then I would decide to close the work order. If the temperature reading indicates that the apartment lacks sufficient heat and hot water, it is illogical to close the work order, even if the boiler's repaired. No comments; no one agrees or disagrees with me?

\*\*\*

[Defendant Olatoye]: Your point is both heard and I think it is something that we need to, and I will direct staff to review our policies as to how we use that data in restoring service and follow backup with this Committee.

NYC Council Test. Tr., 76:13-77:22.

### C.   *Inadequate training*

78.   NYCHA and Defendant Olatoye -- with the knowledge, approval, and ratification of Defendants Mayor de Blasio and the City of New York -- engage in a policy, practice, or

23

custom of failing to adequately train employees, at all levels, to respond to complaints of inadequate heat as federal and state law require.

79.    On information and belief, NYCHA has failed to train employees to be aware of the minimum temperature requirements imposed local housing laws and the federally-secured obligation to adhere to those standards and otherwise provide habitable living conditions to residents of public housing, as evidenced by those employees' chronic unwillingness and/or inability to promptly honor heating repair requests.

80.    NYCHA has in the past admitted to the role its failure to adequately train its employees has played in the ongoing public housing heating crisis, as evidenced by the terms of the above-referenced settlement requiring top-to-bottom retraining.

81.    Despite being admittedly aware of the importance of proper training, and despite being required to conduct such training pursuant to the terms of disposition of a prior suit over its refusal to adequately heat its tenants' homes, NYCHA failed do so.

82.    The predictable consequence of NYCHA's failures to train its employees was a violation of Plaintiffs' bodily integrity and a deprivation of their due process rights, via subjecting them and fellow class members to the brutal cold of northeastern winters, with no remedy to speak of.

83.    Plaintiffs now bring these allegations, on behalf of themselves and a class of those similarly situated, seeking those remedies.

**Class Allegations**

84.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3). The proposed class is defined as, "All residents of NYCHA-owned public housing within the three years prior to the filing of

this action as to Counts I-III, and six years prior to the filing of this action as to Counts IV & V, and continuing through and until the present."

85.    *Numerosity*. The members of the proposed class are so numerous that joinder of all of their claims is impracticable. The class is comprised of at least 320,000 current or former residents of NYCHA public housing. The putative class members are unlikely to press their claims on an individual basis because as residents of public housing, all putative class members have limited incomes, and the value of their individual claims is modest.

86.    *Commonality and Predominance*. Common questions of fact and law predominate over questions affecting individual class members. Questions of law and fact common to class members include, without limitation, whether:  (1) NYCHA adequately heated its tenants' homes as required by constitutional, federal, and local law; (2) NYCHA had a policy, practice, or custom of covering up their heating failures; (3) NYCHA's policy, practice, or custom of covering up their heating failures was so widespread as to have the force and effect of an official policy or law; (4) NYCHA and its officials maintained a code of silence as it related to heating failures; (5) NYCHA's policy, practice, or custom of maintaining a code of silence was so widespread as to have the force and effect of an official policy or law; (6) Defendant Olatoye was a final policymaker with the capacity to ratify the policies, practices, or customs complained of; (7) Defendant Mayor de Blasio was a final policymaker with the capacity to ratify the policies, practices, or customs complained of; (8) the final policymaker, Defendant Olatoye or Defendant Mayor de Blasio did, in fact, ratify the policies, practices, or customs complained of; (9) NYCHA was deliberately indifferent to the existence of these policies, practices, or customs complained of; (10) NYCHA's policies, practices, or customs complained of were the moving force behind the deprivation of Plaintiffs and the class' constitutional rights; (11) Defendant

Olatoye's actions, individually, deprived Plaintiff and the class of their constitutional rights; (12) Defendant Mayor de Blasio's actions, individually, deprived Plaintiffs and the class of their constitutional rights; (13) Defendants are liable to Plaintiffs and the class for general damages for exposure to freezing temperatures.

87.     *Typicality and Adequacy*. Plaintiffs' claims are typical of the class as a whole. Plaintiffs and class members' claims arise from the same unlawful practices: NYCHA's failure to heat its units in compliance with constitutional, federal, and local law. Plaintiffs do not present claims that are unique to themselves and instead bring claims typical to the class members. As proposed class representatives, Plaintiffs will fairly and adequately protect the interests of the class as a whole. Plaintiffs do not have any interests antagonistic to those of other class members. By filing this action, Plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated. Plaintiffs are represented by experienced counsel in civil rights and prosecuting class actions.

88.     *Superiority*. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because it will:

   a.   avoid the heavy burden of multiple, duplicative suits;

   b.   avoid the virtually impossible task of getting all class members to intervene as party-plaintiffs in this action;

   c.   allow the Court, upon adjudication of Defendants' liability, to determine the claims of all class members; and

   d.   allow the Court to enter appropriate final monetary relief with respect to the class as a whole.

89.     *Injunctive and Declaratory Relief*. Defendants have acted or refused to act on grounds that apply generally to the Rule 23(b)(2) class as a whole, so that final injunctive or declaratory relief is appropriate respecting the class as a whole. More specifically, Defendants have failed to heat homes in compliance with constitutional, federal, and state law and have promulgated and engaged in customs, policies, and practices common across NYCHA-owned and/operated buildings that have prevented that failure from being remedied.

**Additional Allegations Regarding NYCHA's Cover-Up of Maintenance Failures**

90.     While Plaintiffs specifically bring claims in this action regarding deficient heat temperature conditions, these conditions are the result of a cover-up of systemic maintenance failures that have led to a numerous other horrific and outrageous conditions being present in NYCHA apartments, including the following, without limitation:

a.  Flooding and excessive moisture, including sewage, often resulting in mold, as NYCHA even admitted to in the Consent Decree that in nearly 300 cases between 2014 and 2016, the verified mold growth covered more than 100 square feet (Exh. B, pg. 2);

b.  Crumbling plaster and dust and exposed building interiors;

c.  Collapsing walls and/or ceilings and structural damage;

d.  Broken elevators;

e.  Vermin infestation, including, without limitation, rats, mice, and roaches, as NYCHA even admitted to in the Consent Decree that between 2013 and 2016, there were more than 260,000 roach work orders (a number that has nearly doubled between 2013 and 2016), more than 90,000 mice work orders (a

number that has been increasing since 2013), and nearly 36,000 rat work

orders (a number that has been increasing since 2013) (Exh. B, pg. 3).

    f.   Inadequate security, including broken building and individual unit locks and

nonfunctional cameras.

91.    The conditions endured by Plaintiffs, as described throughout this complaint, are

typical of those experienced by residents throughout NYCHA housing.

92.    For example, public comments submitted in connection with *United States of*

*America v. New York City Housing Authority*, No. 1:18-cv-5213 (S.D.N.Y.) contains hundreds of

pages of accounts strikingly similar to Plaintiffs' accounts. A sample of these accounts follows:

    a.   "Since living in NYCHA I have experienced many, many, many cold winters without heat. I have to heat my bedroom with a small heater. I have to sleep in clothing and stay in the bed to feel warm. I have also many health problems, also beginning disable (*sic.*). My age is 63 years old." – Cynthia Barrett [Comments 00132]

    b.   "Over the years, I have experienced issues with gas in my kitchen, lack of heat in the apartment, mold in the bathroom, and water leaking from pipes in the bathroom. [...]
"The lack of heat has always been a problem in the apartment. When the season changes and citizens are supposed to get heat, heat is rarely if ever turned on. During the Winter of 2017-2018, numerous calls were placed with the Call Center to report a lack of heat; no response from NYCHA/maintenance and not (*sic.*) heat. Once again, this is unacceptable for anyone, especially a senior citizen. [...]" - Margaret Brishbon [Comments 00224]

    c.   "I have spent whole winters without heat heat in the apartment, having to use an electric heater for warmth during the worst of the cold. This includes issues with the windows, as they are not weather proof and cold leaks through during the whole winter. The heaters themselves are damaged; they have holes in them, which would be a problem if they worked. [...]
"This has been a constant battle with NYCHA. I have called and gone to the management office to place repair requests or make complaints about the lack of help. I've never received any assistance, and the person in charge of the building, Ms. Paulino, has been rude, disrespectful, and horribly unhelpful. It had been so bad that I have requested a transfer to be switched to a, hopefully, better building. As it turns out, as it was explained to me, my transfer paperwork was forgotten and never submitted." – Maria Cabral [Comments 00282]

    d.   "This past winter we did without heat most of the winter. Also most morning (*sic.*) with no water or hot water." – Ramon Cordero [Comments 00367]

e.     "It is not pleasant nor is it comfortable living in the apartment.
"The problems are, inadequate heat and hot water, mold, rodent infestation, and filthy hallways.
"In 1998, I took the New York City Housing Authority to court for inadequate heat and hot water in my apartment. The heat is generated by hot water, so when the water gets cold the apartment becomes cold. We have to use alternative methods to keep warm, in addition to putting 3 curtains to every window. The NYCHA maintenance staff would tape plastic to the windows. When the temperature drops below 32 we would sometimes leave to stay with relatives. [...]" – Annette Cummings [Comments 00410]

f.     "I am 73 years old and each year when the heat comes my apt. has no heat. [...] I had to buy heaters and burn the stove to keep warm. 2017 was the worst I almost caught pneumonia." – Hilda Cummings [Comments 00414]

g.     "Running water and heat are constantly unavailable throughout the years for at times a durations (*sic.*) of several hours to multiple days, In the winter despite the low temperatures there would be no heat or hot water. [...] Recently, there was a gas leak in the building which resulted in multiple apartments including my own to be without access to gas. For an entire month I was unable to cook and use my stove. [...] These issues have been reported and yet to have been resolved (*sic.*). It is typical for repairs in the apartment to take weeks or months to receive attention and only temporary solutions." – Lorraine Ferguson [Comments 00590]

h.     "[T]here is no boiler for two years. In my apartment there are six windows, that are not in good conditions at all, in the winter time the apartment is extremely cold." – Rafael Fernandez {Comments 00593]

i.     "There were many occasions during the winter season when there was no heat or hot water. This has been an issue for several years. Too many times I woke up in the morning and no heat or hot water. Having to boil water just to bathe or wash dishes making the morning off schedule due to extra time boiling water. They used to give us notices if working on boiler (*sic.*) so you can prepare for the next morning." – Rodney S. Jones [Comments 01204]

j.     "I have been living with my family in this building for the past 11 years. During this time, my family and I have been exposed to a wide variety of building malfunctioning such as lack of heating service and hot water especially during winter. [...]
"As a tenant, it is frustrating that I have to call management many times to report concerns and it has a great deal of time of issues to be addressed (*sic.*).. [...]
"As a responsible tenant, I strongly believe that we deserve to live in a clean, safe, and decent residence." – Silvia Padilla [Comments 01643]

k.     "During the past winter, I had to board my place with card boards. The windows are not closed properly. Air comes in around the frames of every windows (*sic.*). Sometimes there was no heat or hot water for days. I called many times for heat issues with no avail." – Sandra Paul [Comments 01688]

l.     "I never have any heat because they claim they are fixing the boiler every winter. The heater in my son's bedroom does not have the valve that opens and closes the heater for three years. [...] I have made several complaints about the above issues

for three years now and it has not been resolved. There is never any hot water as well as pressure." – Maria Perez [Comments 01723]

m.   "In the winter we get no hot water or heat for weeks at a time all the windows need to be replaced (*sic.*). This summer if we had hot water twice a week is a miracle (*sic.*). [...] I requested a transfer and they said they lost my request. Please help me!!" – Madeline Quinones [Comments 01801]"

n.   "When tenants put in tickets we get a date and time when a worker is coming for repair. There's time (*sic.*) that I've taken the day off from work to wait for a repair and after waiting for hours, I get an update that supposedly someone came and there was no answer. So not only you had to wait days (*sic.*) to have someone come to your house but I also took the day off and they stiff didn't show. [...]

"I can't even tell you how many times I call to tell them we have no hot water. A few months ago we spent consecutive days with no hot water. During the winter months we go without heat. Every time I ask the porter why there's no heat, he says 'we need a piece of the boiler to get replace.'

"I also would like you to know that I'm currently paying $1724.00 of rent and I'm sure I'm not the only working resident that has to pay this much. It's sad because we can't get repairs. All this rent money collection where is it going? Clearly not for repairs." – Elizabeth Reyes [Comments 01855]

o.   "This past winter was the low-light of them all when it comes to a state of collusion, that is, someone or some group within NYCHA & city government decided to cut off all heat, hot water, and maintenance of the grounds to a point of literally unlivable conditions." - Edward Rivera [Comments 01885]

p.   "[T]he problem I am having with Housing is that there is **no heat** [emphasis in original]. Every year in the [w]inter I have to buy a heater just to stay warm, it's very cold in my [b]edroom and that's just one room I have a heater. The other rooms I need to have the stove on in the kitchen just to heat up the living room in the front of the apartment and when I don't us (*sic.*) the stove, like for the summer it burns out because I us (*sic.*) it for the winter. [...]

"I hope something is done because I can't keep taken (*sic.*) days off for housing to come and fix thing in my apartment and then they do not show on the day I am schedule (*sic.*). Please rectified (*sic.*) the problem because [tenants] who pay thousands of dollars to rent from public housing should not live like this. We work hard for our money to pay you so we could live safe and comfortable in your dwellings." – Veronica Simmons [Comments 02121]

q.   "The boiler needs repair; it is frequently out of order and we have no heat or hot water. [...]

"The seniors deserve better accommodations that what are being provided for us at present. We are asking for your help [...]." – Senior Tenants at Mount Park Housing [Comments 02160]

r.   "Since my toddler and I have moved in, I haven't had a week go by that I don't find myself in disgust with the upkeep (really lack thereof) and inhabitable conditions of these buildings. [...]

"During the winter months heat and hot water were scarce. I have never had to boil water to warm a bath of ice cold water to bathe my child before, or wake up to no water. I now store 3 gallons of water in my pantry in case the water goes out

I'll be able to bathe my child. I have entered at the very least 15 [...] which equates to half a month without heat AND (not or) hot water [emphasis in original]. I recall showering at a friend's before work 3 days in a row while snow was still on the ground. I also recall layering with 3 blankets so that my toddler would be warm throughout the night just to awake to a notice at 7:20 am that water would be shut off at 8am for the day (and more than not, we didn't even get a notice). [...]

"When it comes to rent collection, the notices and efforts are relentless but to carry out actual repairs, to ensure that residents are living in a space that is safe, sanitary, habitable, free of damage or harmful fixtures, the response is lackluster, there's a lot of foot dragging and it's like pulling teeth." – Donna Stewart [Comments 02212]

These comments, with the quoted language highlighted, are attached as <u>Exhibit C</u>.

93.     The entirety of these public comments, contained in Docket Entries 41-2, 41-3, 41-4, 41-5, 41-6, 41-7, 41-8, 41-9, 41-10, 41-11, 41-12, 41-13, 41-14, 41-15, 41-16, 50-2, 58-2, 58-3, and 58-4 in the action referenced in Paragraph 92, above, are incorporated herein by reference.

94.     These maintenance failures each result from the same "Code of Silence" course of conduct engaged in by NYCHA with respect to its efforts to hide from the public its failures to adequately staff, train, and fund NYCHA maintenance operations and shield its senior managers and those who oversee them from accountability, and the maintenance failures evidence NYCHA's pattern of conduct with respect to its treatment of tenant maintenance requests, generally, and heat-related requests, specifically.

**FIRST CLAIM FOR RELIEF:[3]**
**42  U.S.C. § 1983; DEPRIVATION OF RIGHTS UNDER 42 U.S.C.  § 1437 *et seq.***
**AS TO DEFENDANTS NYCHA AND OLATOYE**

95.     Plaintiffs re-state and re-allege Paragraphs 1-94 of this Second Amended

Complaint, as though fully alleged into this Count I.

96.     Plaintiffs and class members were deprived by Defendants of rights and privileges

secured by "the Constitution or laws" of the United States.

97.     This deprivation occurred under color of state law and pursuant to the policies,

practices, customs, and procedures of Defendants NYCHA and Olatoye.

98.     Specifically, Defendants have deprived Plaintiffs and class members of the right

to a safe and habitable heated home in compliance with federal law and federal regulations cited

herein.

99.     42 U.S.C. § 1983 provides that a private right of action exists for anyone deprived

of "rights, privileges, or immunities" secured by "the Constitution or laws" of the United States.

100.    42 U.S.C. § 1437 provides in relevant part:

> (a) Declaration of policy
> It is the policy of the United States—
> (1) to promote the general welfare of the Nation by employing the funds
> and credit of the Nation, as provided in this chapter—
> (A) to assist States and political subdivisions of States to remedy the
> unsafe housing conditions and the acute shortage of decent and safe
> dwellings for low-income families;"

101.    42 U.S.C. § 1437d(l)(3) provides the following, in relevant part:

> (l) Leases; terms and conditions; maintenance; termination
> Each public housing agency shall utilize leases which—
> [...](3) obligate the public housing agency to maintain the project in a
> decent, safe, and sanitary condition;"

---

[3]     As noted above, this Count was previously dismissed pursuant to Rule 12(b)(6) and is re-
alleged to preserve this issue for appeal, if any, and to the extent the substantive state and federal
regulations are relevant to the nuisance and habitability counts alleged below.

102.    42 U.S.C. § 1437 and 42 U.S.C. § 1437d(l)(3) were intended to benefit Plaintiffs

and class members, provide concrete rights, and are phrased in mandatory language.

103.    Further rights are granted under federal law for Plaintiffs and the class under

federal implementing regulation 24 CFR 5.703.

104.    24 CFR 5.703, titled "Physical condition standards for HUD housing that is

decent, safe, sanitary and in good repair," vests in public housing recipients a federally-protected

right to living conditions in public housing that meet the requirements imposed by state and local

housing laws and regulations – here, NYC Administrative Code § 27-209 and New York City

Health Code § 131.07 regarding the minimum acceptable temperature for an occupied housing

unit during the winter months.

105.    NYC Administrative Code § 27-209 provides, "Minimum temperature to be

maintained," and states in relevant part,

> a. During the period from October first through May thirty-first, centrally supplied heat,
> in any dwelling in which such heat is required to be provided, shall be furnished so as to
> maintain, in every portion of such dwelling used or occupied for living purposes: 1)
> between the hours of six a.m. and ten p.m., a temperature of at least sixty-eight degrees
> Fahrenheit whenever the outside temperature falls below fifty-five degrees; and 2)
> between the hours of ten p.m. and six a.m., a temperature of at least fifty-five degrees
> Fahrenheit whenever the outside temperature falls below forty degrees.

106.    New York City Health Code § 131.07(c) provides that,

> the minimum temperatures required by subdivision (a) of this section shall be maintained
> as follows:
> (1) In a dwelling, during the months between October first through May thirty-first,
> centrally between the hours of six a.m. and ten p.m., a temperature of at least sixty-eight
> degrees Fahrenheit whenever the outside temperature falls below fifty-five degrees; and
> 2) between the hours of ten p.m. and six a.m., a temperature of at least fifty-five degrees
> Fahrenheit whenever the outside temperature falls below forty degrees.

107.    The systemic failure of NYCHA to adequately maintain and repair heating

systems in public housing complexes throughout New York City violates NYC Administrative

Code § 27- 209 and New York City Health Code § 131.07 and has subjected hundreds of thousands of low-income New Yorkers to untenably cold conditions within their public housing residences.

108.    This continuing failure has deprived each of those New Yorkers, including Plaintiffs and class members, of their federally protected rights to public housing living conditions that are in compliance with NYC Administrative Code § 27-209 and New York City Health Code § 131.07.

109.    Under the color of law, Defendants have provided unsafe housing in violation of federal law, implementing regulations, and the above-cited local codes.

110.    As a result of this violation, Plaintiffs and class members have been deprived of federally protected rights and have thereby been damaged in the form of economic loss of value of rent and pain and suffering from exposure to extreme cold within their residences.

WHEREFORE Plaintiffs, Chiffon Davis, by and through her attorneys, respectfully prays for the following relief, individually and on behalf of the Class:

A.    A rent abatement in the amount of 100% of each Plaintiffs and class members' respective rent obligations;

B.    An award of actual damages in an amount to be proven at trial;

C.    An award of punitive damages;

D.    An award of reasonable attorneys' fees and costs;

E.    Such further and other relief as this Court deems reasonable and just.

**SECOND CLAIM FOR RELIEF:**
**42 U.S.C. § 1983; VIOLATION OF RIGHT TO SUBSTANTIVE DUE PROCESS**
**AGAINST DEFENDANTS OLATOYE AND NYCHA**

111.    Plaintiffs re-state and re-allege Paragraphs 1-94 of this Second Amended

Complaint, as though fully alleged into this Count II.

112.    A "code of silence" exists at NYCHA. This "code of silence" consists of the

custom, practice, and policy of covering up reports of systemic safety violations at NYCHA-

owned or operated buildings, including vast numbers of reports of un-remedied boiler and other

heating failures. This custom, practice, and policy is enforced at the highest level by Defendant

Olatoye, who at all relevant times was under the political protection of Defendant de Blasio and

therefore regarded herself as invincible and not accountable to the law, the City Council, or

anyone else. Indeed, after working at NYCHA, Defendant Olatoye received a well-paying

private-sector job from Suffolk Construction, a construction company owned by a high-dollar

contributor to Mayor de Blasio's political campaign(s).

113.    In March of 2016, Defendants purported to undertake remedies to the heating

violations gripping NYCHA public housing during that winter. Defendants were on notice that

record-cold winters spurred by climate change were foreseeable in the future.

114.    But rather than act to maintain safe, heated homes for NYCHA residents,

Defendants engaged in a cover-up in line with the "code of silence" referenced above.

115.    This cover up affirmatively placed Plaintiffs and class members in danger of

exposure to extreme cold in their own homes.

116.    Plaintiffs and class members have a special relationship with Defendants, because

NYCHA is a public housing agency that exists for the express purpose of providing safe,

habitable dwellings to the low-income individuals and families who reside in its housing, including Plaintiff and members of the putative class.

117.    Plaintiffs and class members are in the care of Defendants.

118.    Under the substantive due process clause of the Fourteenth Amendment to the United States Constitution, Plaintiffs and class members have clearly established fundamental rights to bodily safety, integrity, and liberty, which are jeopardized by exposure to extreme, freezing cold temperatures.

119.    Plaintiffs and the class also have property interests in their leases which establish their rights to the quiet and safe enjoyment of their rented homes.

120.    The conduct of Defendants, all while acting under color of law, constituted affirmative acts that shock the conscience and amounts to a violation of substantive due process and that gave rise to a state-created danger.

121.    Rather than repair the heating systems that heat the homes of Plaintiffs and class members, Defendants conspired to cover up the failure to maintain homes at 68 degrees rather than repair and replace boilers as needed to heat homes after the previous heat settlement.

122.    Defendants created and increased the danger to Plaintiffs and class members by failing to properly maintain the equipment heating their homes and by covering up that failure.

123.    The cover up by Defendants, including, without limitation, Olatoye and Mayor de Blasio, created an opportunity for foreseeable cold weather to harm Plaintiffs and class members through exposure to extreme cold temperatures within their residences.

124.    But for Defendants' cover-up and "code of silence," the heating systems associated with the homes of Plaintiffs and other class members would have been timely repaired, and they would not have been subjected to such harm.

125.    The code-of-silence and other practices and customs discussed herein that deprived Plaintiffs of their constitutional rights were so widespread and implemented by final policy makers such as Defendants Olatoye and Mayor de Blasio, such that they had the force and effect of an official policy or law.

126.    Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily safety, integrity, and liberty by exposure to extreme cold in their homes.

127.    Exposure to freezing cold temperatures violates the bodily safety, integrity, and liberty of Plaintiffs and class members.

128.    Defendants also intentionally or with deliberate indifference deprived Plaintiffs and class members of property interests by intentionally or with deliberate indifference maintaining Plaintiffs and class members' homes in an unheated, uninhabitable condition.

129.    Defendants deliberately and knowingly breached the constitutionally protected fundamental rights and property interests of Plaintiffs and class members by creating and perpetuating a policy, practice, or custom of cover-up and code of silence that intentionally or with deliberate indifference put hundreds of thousands of people in freezing homes in such a manner that shocks the conscience.

130.    As a direct result of the policies, practices, and procedures established and enforced by Defendants Olatoye and NYCHA, as described herein, the true extent of NYCHA's heating failures was obscured from the public, from federal authorities, and from other bodies that might have the power to address or interest in addressing such failures, including, without limitation, the New York City Council.

131.    As a direct result of these policies, practices, and procedures, Plaintiffs were deprived of the opportunity to seek relief from NYCHA in the form of required repairs, through the administrative system established by NYCHA for receiving and responding to requests for such repairs.

132.    This deprivation proximately caused Plaintiffs' injuries; to wit, the lack of a habitable residence despite the payment of rent in consideration for such a residence, and the ongoing impingement to Plaintiffs' bodily integrity that results from being forced to live in that uninhabitable residence.

133.    The Defendants' intentional conduct or deliberate indifference to the policies, practices, and customs discussed herein were the moving force behind the violation of Plaintiffs' constitutional rights.

134.    As a result of this violation, Plaintiffs and class members have been damaged in the form of economic loss of value of rent and pain and suffering from exposure to extreme cold within their residences.

WHEREFORE Plaintiffs, Chiffon Davis and India Williams, by and through their attorneys, respectfully pray for the following relief, individually and on behalf of the Class against Defendant Olatoye, individually and in her official capacity, and Defendant NYCHA:

A.    An injunction requiring that each and every relevant class member residence be provided with reasonable means to maintain prescribed indoor temperatures during all seasons, without interruption;

B.    A rent abatement in the amount of 100% of each Plaintiff's, and each class member's, respective rent obligations;

C.    An award of actual damages in an amount to be proven at trial;

D.      An award of punitive damages

E.      An award of reasonable attorneys' fees and costs;

F.      Such further and other relief as this Court deems reasonable and just.

**THIRD CLAIM FOR RELIEF:**
**42 U.S.C. § 1983; VIOLATION OF RIGHT TO SUBSTANTIVE DUE PROCESS**
**AGAINST DEFENDANTS MAYOR DE BLASIO AND THE CITY OF NEW YORK**

135.    Plaintiffs re-state and re-allege Paragraphs 1-94 and Paragraphs 111-134 of this
Second Amended Complaint, as though fully alleged into this Count III.

136.    As Mayor, Defendant de Blasio has taken a particular interest in the issue of
affordable housing, generally, and the operation of NYCHA, specifically. Mayor De Blasio
personally involved himself in the day-to-day management and oversight of NYCHA and
spearheaded the development of a new "operating plan" for NYCHA shortly after he took office.
Mayor De Blasio has repeatedly taken responsibility for the operation of NYCHA in public
statements, on behalf of both himself and the City of New York.

137.    In this oversight role, Mayor de Blasio participated in the development of, and
personally ratified, the aforementioned NYCHA policies, practices, and procedures that
deliberately concealed the extent of NYCHA's heat-related failures from the public and the
courts, including, without limitation, the practice of prematurely closing maintenance repair
tickets before repairs were complete in order to obscure evidence of NYCHA's deficient repair
response times.

138.    Additionally, Mayor de Blasio has been responsible for appointing NYCHA
board members and NYCHA Chairs, including Defendant Olatoye, since he began his term as
Mayor. NYCHA Chairs, in particular, serve at Mayor de Blasio's pleasure and can be removed
by him.

139.     Even after news regarding NYCHA's systemic heat-related failures and other
maintenance-related malfeasance sparked public backlash over the previous several years,
Defendant Mayor de Blasio refused to demand Olatoye's resignation. Indeed, Mayor de Blasio
stood by her, repeatedly making public statements in her support and ratifying her actions as
Chair, including those actions establishing NYCHA's policies, practices, and procedures related
to the cover-up of its heating failures described herein.

140.     Because Mayor de Blasio ratified Defendant Olatoye's policymaking and adopted
it as his own, Olatoye remained the Chair of NYCHA throughout the winter of 2018, wherein her
policies, practices, and procedures continued while the heating conditions within NYCHA
apartments, including, without limitation, Plaintiff's apartment, continued to worsen. Because of
Mayor de Blasio's ratification, Plaintiff and other NYCHA residents were forced to endure yet
another Northeast winter without any substantive effort to effect the repairs needed to provide
them with heat. Defendant Olatoye did not resign until April, 2018.

141.     Questioning and answers between New York City Council Member James G. Van
Bramer ("Council Member Van Bramer") and Defendant Olatoye during testimony on February
6, 2018, further demonstrates Defendant Mayor de Blasio's responsibility for the heat failures:

> [Council Member Van Bramer]: Thank you very much. First of all, I just wanna
> say, Madam Chair, that we've done a lot of good work together; 143,000 units out
> of 175,000 having no heat or hot water represents a complete and utter collapse of
> public housing in New York City, because if it's 10 degrees outside and you don't
> have heat and hot water, it's 10 degrees inside and you might as well not have a
> house. But I wanna say a few things about the chain of command, because you are
> here getting grilled, and I have to say I've been at over a thousand hearings in my
> 9th year as a City Council Member now; this is one of the worst that I've ever seen
> in terms of performance. You're here, but you report to somebody, right; your direct
> report is… is it the First Deputy Mayor or?
>
> [Defendant Olatoye]: Deputy Mayor Alicia Glen.

[Council Member Van Bramer]: Right. And I understand that she's a very smart person and she knows a lot of things about a lot of things, … so what I'd like to know is; how often do you meet with her; how often are your direct reports to Alicia Glen?

[Defendant Olatoye]: Weekly.

[Council Member Van Bramer]: Weekly. And is she responsive to the needs of public housing residents?

[Defendant Olatoye]: We work very closely together and the investment that we have to date is reflective of that support.

[Council Member Van Bramer]: Is that investment enough and is it good enough for the residents of public housing?

[Defendant Olatoye]: Council Member Van Bramer, you will not get an agreement that we don't have so much more to do; I will not say that, and I don't think she would say that either, but what…

[Council Member Van Bramer]: Well then because she's so smart, she should probably do better at funding and doing things for residents of public housing. I just wanna say this to you; Chair, we've done some good work together in Queensbridge, Ravenswood and the Woodside Houses and you're getting grilled here and appropriately so, because a lot has gone wrong, but you, by protecting the Deputy Mayor, don't do any service to yourself or to the residents of public housing; I wanna go beyond, because Alicia  Glen reports to somebody too, and that's the Mayor of the City of New York, right?

[Defendant Olatoye]: Correct.

[Council Member Van Bramer]: So how often do you meet with the Mayor of the City of New York? …

[Defendant Olatoye]: I meet with the Mayor on a sort of as-needed basis; we absolutely have been in touch [bell] much more regularly, as you can imagine, over the last several weeks, uhm but over the course of the last four years … there's been… bless you… there's been, you know, quarterly, at least, you know, important sit-down sessions with the Mayor on various issues as it relates to the work of the Housing…

[Council Member Van Bramer]: When was the last time you met with the Mayor?

[Defendant Olatoye]: I was with the Mayor last Thursday.

[Council Member Van Bramer]: Meeting on this crisis?

[Defendant Olatoye]: On this and other issues, yes.

[Council Member Van Bramer]: Okay, 'cause I just want to state for the record one of the things…

[Defendant Olatoye]: Last Wednesday, excuse me.

[Council Member Van Bramer]: uh we were at the Woodside Houses with the Mayor, because that was one of the developments that went down in this crisis, but the Woodside Houses is not among your top 20 and among the $200 million that are being funded. I was in that boiler room with the Mayor of the City of New York and the gentleman who runs all of your boilers -- who is not here today by the way and I thought he was very knowledgeable -- and those boilers there are very old, many of them, but we're not in the plan at the Woodside Houses. Isn't it shortsighted not to fund and replace those boilers now instead of waiting until they go down as well and, a. forcing the people in the Woodside Houses to go through themselves another moment of crisis, but also won't it be even more expensive at the time? 'Cause if you're not replacing the boilers and if the Mayor's not putting up the money to replace the Woodside Houses as well, you're just waiting for that to go down as well, another system to go down, another development to go down; the money needs to be there not just for those 20 worst, but for all of the ones that have boilers that are 40, 50, 60 years old 'cause you're just waiting for them to collapse as well[.]

NYC Council Test. Tr., 131:2-135:11.

142.    Also during the February 6, 2018, testimony before the New York City Council

Member Barry Grodenchik's ("Council Member Grodenchik") discussion with Defendant

Olatoye further revealed Defendant Mayor de Blasio's responsibilities:

[Council Member Grodenchik]: … I am also a proud NYCHA alum, having grown up in Pomonok Houses in Councilman Lancman's district; my family was there for 50 years and 6 months; we were refugees from the Bronx, we came from the Bronx in 1956; we emigrated. I am, frankly… I came here to listen today, but I am… on my way in I heard the report by the *Daily News*; I am absolutely staggered by what I have heard today; this is not the NYCHA that I grew up in, this is not the NYCHA that I knew; I know it's been a long time since I've lived in public housing, but I just am blown away by what I've heard today. And the thing that bothers me the most, Madam Chair, I think is that there doesn't seem to be a sense of urgency among the senior staff here today. I regret having to make that statement because I know that you show up to work every day and you're trying, but it just doesn't seem that there's any sense of urgency among the senior staff at NYCHA. The fact that 80 some odd percent of the residents of New York City public housing, the best

42

public housing in the United States of America, could be without heat at some point this winter, even in this cold weather, is just beyond my imagination, I can't understand that and I have not heard any answer today that really explains that.

I do want to ask you several questions. First, you told Councilman Van Bramer, when he asked, that you meet on a regular basis with Deputy Mayor Glen; was Deputy Mayor Glen aware of the fact that over 80% of the residents of NYCHA had been without heat at some point this winter?

***

[Defendant Olatoye]: You know we meet weekly and receive… and she receives daily…

[Council Member Grodenchick]: I know you meet weekly; I asked you a direct question; I'd like to know if she was…

[Defendant Olatoye]: Well one, my job is to provide her the information and that's what I've done.

[Council Member Grodenchick]: Okay, so she was aware? Are you saying she was aware …

[Defendant Olatoye]: I provide reports… You'll have to ask her if she knew specifically to that report so …

[Council Member Grodenchik]: She's not here this morning, she's busy somewhere else. I asked you a direct question. Was she aware? Yes or no; you're under oath…

[Defendant Olatoye]: I… I can't… cannot answer that question …

[Council Member Grodenchik]: Okay, you can't answer that question. So … At any point during the time that you've spent at NYCHA -- and Miss Glen and you have been her since the beginning of the current administration -- we are investing billions and billions of dollars, and I think everybody here agrees with that, everybody on this panel and I think everybody in the room; we need new housing in the City of New York; there's no question, but as a homeowner I understand that if my roof is leaking I'm not building an addition onto the house till the roof is repaired. Have you at any time had a discussion with Miss Glen or the Mayor that maybe we should be diverting some of these resources into NYCHA? Because even though the federal government is no longer providing funding at the level that they did when I was growing up at NYCHA, that does not absolve the citizens of this city from providing for the people -- over 400,000; [clapping, background comments] some estimates 600,000 people living in NYCHA. Have you ever had that conversation that maybe we could take a few more bucks away from new housing and provide it for the people at NYCHA?

43

[Defendant Olatoye]: As you can imagine, this is a difficult policy …

[Council Member Grodenchik]: It is a very difficult process, yes.

[Defendant Olatoye]: And… and probably not… I don't win friends in trying to take away resources…

[Council Member Grodenchik]: I don't envy you right now, believe me.

[Defendant Olatoye]: from… from other… from other sources, but yes, we have had those conversations and I think ultimately that's the discussion that, you know this body and the Mayor and others will decide. You know we've been very clear about the needs of public housing, about the capital needs, and while also recognizing that the City has an affordable housing crisis; I get that those are difficult policies that… [crosstalk]

[Council Member Grodenchik] It does have an affordable housing crisis, and I'm just gonna end with this statement, Mr. Speaker and the two chairmen. If we don't get this thing together and wrestle this to the ground, we are going to have a much larger affordable housing crisis than anybody ever imagined; we already have 60,000 people living in shelters every single night and each and every day that we fail to fix this problem, that problem is gonna get worse and worse.

NYC Council Test. Tr., 141:11-145:22.

143.    Even the flagrant hypocrisy of Defendants Mayor de Blasio and Olatoye's

preaching to the public but overseeing critical failures in heating was put on display during the

testimony before the New York City Council on February 6, 2018:

[Co-Chair Ampry-Samuel]: Okay. I just became aware that the Mayor was just doing a press conference outside, just now, and the Mayor was just asked if public housing tenants deserve the same standard of living as private tenants, and the Mayor stated, "People in public housing deserve the very best living standard we can give them with the money that we have." … Do you agreewith that statement?

[Defendant Olatoye]: So one, obviously I didn't know the Mayor was doing a press conference and I don't know the context of what he just said, but I know that we share an agreement that our residents deserve a safe, clean and connected community and I know that he's committed to that. …

[Co-Chair Ampry-Samuel]: So NYCHA -- just you, Chair -- the statement says: "People in public housing deserve the very best living standard we can give them

with the money that we have." So my question is: Do you agree with that statement, from your position?

[Defendant Olatoye]: I think people should have the same living conditions that I have and that you have, period. I also, in this job, recognize the limitations that we are experiencing; does that make me happy about it? Absolutely not. But I know, because I decided to work for this Mayor, that he believes that every New Yorkers, every American has the right to a safe and decent place to live; I know that. I also know we are managing a system that has been long -- and I won't spend a lot of time on disinvestments -- but that's our reality, and so we are trying to improve it. Will we make mistakes? Yes, but there is a lot of work to be done and I know he is committed to getting it right.

[Co-Chair Ampry-Samuel]: Okay. Thank you. Council Member Richards.

[Council Member Richards]: Thank you, Chairs. And I want to in particular focus in on the plight of Redfern Houses, which residents were without heat and hot water on and off for two weeks, as you know, and I thank you and Brian for being responsive during that period. However, there were serious breakdowns and systematic failure during that period. One; there were no robocalls that went out; there was not a warming center that opened up; individuals' tickets were being closed out, although they were still without heat, and I think the most troubling part of this was the failure of compassion for these residents. You know we can get into the weeds of everything, but it should be about compassion as well.

I wanted to know, what do we have in place; how are you working with OEM? Because when people are without heat and hot water, especially in below zero degree weather, I wanna know; what does the coordination look like with the Office of Emergency Management, because it is deemed an emergency at that period? Residents weren't given basic necessities, like blankets and perhaps… you know there are other things that we could've entertained -- a heater -- something that could've ensured that residents -- although they understood there was a problem, the City could've responded in a better fashion in that way. So I wanna know about coordination with OEM during these sort of emergencies.

[Defendant Olatoye]: So I'll take it and then I'll turn it over to our incoming GM. One, we work very closely, particularly in instances around emergencies, with OEM and were in constant communication with them particularly during this cold spell. We at one point had, I believe an OEM warming bus that was provided to Redfern and Redfern was…

[Council Member Richards]: But OEM never responded to Redfern.

[Defendant Olatoye]: Then I'll correct the record and…

[Council Member Richards]: Alright. Okay.

[Defendant Olatoye]: and we'll come back to that. But as you know, Redfern was a particular outlier in the number of and the complexity of the interruptions that we faced there. You and I were on the phone when you were in the community center where we, you know, kept it open later -- senior center, I believe -- where we kept it open for the residents so that they could have heat. So…

[Council Member Richards]: But there was no heat in the center, so I just…

[Defendant Olatoye]: And…

[Council Member Richards]: wanna make sure that I'm very… that I'm correcting that…

[Defendant Olatoye]: Okay, but I believe…

[Council Member Richards]: and then, you know, it did come on eventually…

[Defendant Olatoye]: Thank you. Thank you.

[Council Member Richards]: but there was no heat even in …

[Defendant Olatoye]: So it's a point of both acknowledging the complexity of what Redfern presented to us and then your question about our coordination with OEM. We absolutely, in times of emergency, reach out the them; they reach out to us, whether it's in the need of do we need additional resources; do we need a warming bus; is there a need to open a temporary shelter; that tends to be the last resort if the outage is going to go for a protracted period of time…

[Council Member Richards]: So I'll just say -- 'cause I have limited time -- that did not happen in Redfern and the heat was on and off for two weeks. So in the future I'm hoping that we're gonna really correct the situation. I also wanna dig into that number, 707, which needs to be abolished, quite frankly, in my opinion [background comment] and it's not just related to the heat and hot water issues, as your new GM Vito, who I adore, witnessed just last week, you know, residents have continuous problems with this hotline, whether it's heat and hot water; whether it's mold; whether it's things that need to be intimately taken care of in their apartment, their tickets are continuously being closed out without action being taken. He got to see it firsthand and hear it from residents -- unplanned; I didn't tell these residents to show up in their manager's office; they were just coming in to get assistance. I wanna know, should we keep this number or should residents be calling 311; how are we tracking these complaints? Vito, how are we gonna ensure that the system you have with HPD is something that we can have in place at NYCHA…?

NYC Council Test. Tr., 157:16-162:6.

144.   New York City Council Member Ruben Diaz, Sr. ("Council Member Diaz") also voiced his concern about Defendant Mayor de Balsio's involvement, along Co-Chair Torres' concern about Defendant Olatoye's false testimony:

> [Council Member Diaz to Defendant Olatoye]: I… I… uh you know, I remember when the Mayor was a candidate for Mayor; he went with Al Sharpton, Rev. Al Sharpton and they spent the night in public housing and then in morning, candidate de Blasio said, "If I get elected, I will fix this." But the same people that are surrounding you were there then, or most of them, they weren't there then, and I'm afraid… I am afraid, and I might be wrong, [bell] that the Mayor has put you in front to get all the heat, and … you, but the people responsible, the real responsible for the discrimination and the racism done to our people that live, black and Hispanics that live in public housing are those surrounding you. And I will say that if the Mayor really wants to help and comply with the promise that he made that if he got elected he will fix the public housing. We've been asking for your resignation [Defendant Olatoye's resignation]; we have been asking for your…

> ***

> [Council Member Diaz]: for you… we have been asking for your resignation, but today sitting here I noticed that all those who surround you are the ones that know, are the ones that are answering the questions and you… sometimes you are sitting there patiently, listening to them and I say, a clean house has to be done; … otherwise…

> [Council Member Diaz]: otherwise the discrimination -- and I'm… listen the words that I'm using -- the discrimination and racism [bell] done to our people will continue.

> NYC Council Test. Tr., 170:10-171:3.

> ***

> I'm actually gonna interject, since… 'cause I do have to ask questions about … You indicated earlier, in response to questions from Councilman Diaz that you make every effort to correct the record. As you know, there was a DOI finding that testimony that you submitted to the Council on December 7th was factually false[.]

> NYC Council Test. Tr., 171:21-172:3.

145.   Even after Defendant Olatoye's resignation, Defendant Mayor de Blasio has continued to be the ultimate policymaker for NYCHA, appointing a new interim Chair who also

serves at his pleasure. Notably, even after the filing of the initial Complaint in this lawsuit, Plaintiffs observed no effort on the part of NYCHA to repair or replace the heating systems within their developments, and endured the winter of 2019 without adequate heat.

146.    The conduct of Defendants, all while acting under color of law, constituted affirmative acts that shock the conscience and amount to a violation of substantive due process and gave rise to a state-created danger.

147.    Rather than repair the heating systems that heat the homes of Plaintiffs and class members, Defendants conspired to cover up the failure to maintain homes at required interior temperatures, failing to repair and replace boilers as needed to heat homes after the previous heat settlement and failing to otherwise address the dangerous heating crisis.

148.    Defendants created and increased the danger to Plaintiffs and class members by failing to properly maintain the equipment heating their homes and by covering up that failure.

149.    Defendants Olatoye and Mayor de Blasio's cover-up created an opportunity for foreseeable cold weather to harm Plaintiffs and class members through exposure to extreme cold temperatures within their residences.

150.    But for Defendants' cover-up and "code of silence," the heating systems associated with the homes of Plaintiffs and other class members would have been timely repaired, and they would not have been subjected to such harm.

151.    The code-of-silence and other practices and customs discussed herein that deprived Plaintiffs of their constitutional rights were so widespread and implemented by final policy makers such as Defendants Olatoye and Mayor de Blasio, such that they had the force and effect of an official policy or law.

152.    Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily safety, integrity, and liberty by exposure to extreme cold in their homes.

153.    Exposure to freezing cold temperatures violates the bodily safety, integrity, and liberty of Plaintiffs and class members.

154.    Defendants also intentionally or with deliberate indifference deprived Plaintiffs and class members of property interests by intentionally or with deliberate indifference maintaining Plaintiffs and class members' homes in an unheated, uninhabitable condition.

155.    Defendants deliberately and knowingly breached the constitutionally protected fundamental rights and property interests of Plaintiffs and class members by creating and perpetuating a policy, practice, or custom of cover-up and code of silence that intentionally or with deliberate indifference put hundreds of thousands of people in freezing homes in such a manner that shocks the conscience.

156.    As a direct result of the policies, practices, and procedures established and enforced by Defendants Mayor de Blasio and the City of New York, as described herein, the true extent of NYCHA's heating failures was obscured from the public, from federal authorities, and from other bodies that might have the power to address or interest in addressing such failures, including, without limitation, the New York City Council.

157.    As a direct result of these policies, practices, and procedures, Plaintiffs were deprived of the opportunity to seek relief from NYCHA in the form of required repairs, through the administrative system established by NYCHA for receiving and responding to requests for such repairs.

158.    This deprivation proximately caused Plaintiffs' injuries; to wit, the lack of a habitable residence despite the payment of rent in consideration for such a residence, and the ongoing impingement to Plaintiffs' bodily integrity that results from being forced to live in that uninhabitable residence.

159.    The Defendants' intentional conduct or deliberate indifference to the policies, practices, and customs discussed herein were the moving force behind the violation of Plaintiffs' constitutional rights.

160.    As a result of this violation, Plaintiffs and class members have been damaged in the form of economic loss of value of rent and pain and suffering from exposure to extreme cold within their residences.

WHEREFORE Plaintiffs Chiffon Davis and India Williams, by and through their attorneys, respectfully pray for the following relief, individually and on behalf of the class, against Defendant Mayor de Blasio, in his individual and official capacity, and Defendant City of New York:

A.    An injunction requiring that each and every relevant class member residence be provided with reasonable means to maintain prescribed indoor temperatures during all seasons, without interruption;

B.    A rent abatement in the amount of 100% of each Plaintiff's, and each class member's, respective rent obligations;

C.    An award of actual damages in an amount to be proven at trial;

D.    An award of punitive damages

E.    An award of reasonable attorneys' fees and costs;

F.    Such further and other relief as this Court deems reasonable and just.

**FOURTH CLAIM FOR RELIEF:**
**BREACH OF WARRANTY OF HABITABILITY**
**AGAINST DEFENDANT NEW YORK CITY HOUSING AUTHORITY**

161.    Plaintiffs re-state and re-allege Paragraphs 1-94 of this Second Amended

Complaint as though fully alleged in this Count IV.

162.    Real Property Law § 235-b requires, in pertinent part, that:

> premises so leased or rented and all areas used in connection therewith in
> common with other tenants or residents are fit for human habitation and for the
> uses reasonably intended by the parties and that the occupants of such premises
> shall not be subjected to any conditions which would be dangerous, hazardous or
> detrimental to their life, health or safety.

163.    As alleged above, Defendant's refusal to complete major and necessary repairs

has resulted in Plaintiffs consistently going without adequate heat and hot water during winters

and other periods of cold temperatures throughout the period relevant to this Complaint.

164.    A residence without adequate heat and hot water, such as Plaintiffs' residences, is

not fit for human habitation and subjects the occupants to conditions that are dangerous,

hazardous, and detrimental to their life, health, and safety, especially in light of harsh New York

winters.

165.    Separate and apart from Defendants' failures to provide adequate heat to the

apartments of Plaintiffs and class members, Defendants has permitted a litany of deficient

habitability conditions to persist within and around said apartments, including the following,

without limitation:

   a.  Flooding and excessive moisture, including sewage, often resulting in mold;

   b.  Crumbling plaster and dust and exposed building interiors;

   c.  Collapsing walls and/or ceilings and structural damage;

   d.  Broken elevators;

  e. Vermin infestation, including, without limitation, rats, mice, and roaches;

  f. Inadequate security, including broken building and individual unit locks and nonfunctional cameras;

166. The existence of these conditions evidences NYCHA's lack of concern for its legal obligation to provide safe and habitable living conditions for each and every tenant of its residential properties, and each such condition has worsened and aggravated the uninhabitable conditions within NYCHA apartments, including Plaintiffs' Residences.

167. By permitting these conditions to persist and refusing to remedy them despite repeated requests from Plaintiffs, class members, and others over the course of years, Defendant has breached the Warranty of Habitability imposed by Real Property Law § 235-b.

168. As a result of Defendant's breach of both the Warranty of Habitability and its obligations under the terms of their tenancy, Plaintiffs have been deprived of the full use and enjoyment of their homes throughout the period relevant to this Complaint.

169. As a proximate result of Defendant's conduct, Plaintiffs have sustained actual damages above and beyond their loss of the use and enjoyment of their homes, including, without limitation, impingement to bodily integrity, personal injury damages due to aggravated medical conditions, and emotional distress damages.

170. All of Defendant's conduct alleged herein was committed intentionally, maliciously, and in bad faith, for the sole purpose of covering up its systemic failure to honor its habitability obligations to Plaintiffs, and class members.

WHEREFORE Plaintiffs Chiffon Davis and India Williams, by and through their attorneys, respectfully pray for the following relief, individually and on behalf of the class, against

Defendant Mayor de Blasio, in his individual and official capacity, and Defendant City of New York:

A.    An injunction requiring that each and every relevant class member residence be provided with reasonable means to maintain prescribed indoor temperatures during all seasons, without interruption;

B.    A rent abatement in the amount of 100% of each Plaintiff's, and each class member's, respective rent obligations;

C.    An award of actual damages in an amount to be proven at trial;

D.    An award of punitive damages;

E.    An award of reasonable attorneys' fees and costs;

F.    Such further and other relief as this Court deems reasonable and just.

**FIFTH CLAIM FOR RELIEF:**
**PRIVATE NUISANCE**
**AGAINST DEFENDANT NEW YORK CITY HOUSING AUTHORITY**

171.    Plaintiffs re-state and re-allege Paragraphs 1-94 and 97-105 of this Second Amended Complaint, as though fully incorporated into this Count V.

172.    NYCHA's failure to provide adequate heat and hot water to Plaintiffs' apartments, as detailed throughout this Complaint, frequently resulted in temperatures within those apartments that were below statutorily prescribed levels.

173.    These temperatures were often so low, especially without hot water, that Plaintiffs were unable to safely perform basic activities, such as sleeping, bathing, and cooking, and experienced constant, unbearable coldness.

174.    NYCHA's failure to provide adequate heat to its tenants was intentional in origin, because, as described throughout this Complaint,  NYCHA knew of its failures for years, and

53

rather than take action to remedy them, it conceived a scheme to hide these failures from the public, thereby worsening rather than improving its' tenants living conditions.

175.   These cold temperatures produced conditions under which no reasonable person could be expected to live and substantially interfered with Plaintiffs' ability to enjoy the real property interest represented by their leases.

176.   But for NYCHA's cover-up and refusal to acknowledge requests for maintenance with respect to heat, Plaintiffs would not have been subjected to freezing temperatures within their apartments in the dead of winter, repeatedly over the course of years.

WHEREFORE Plaintiffs Chiffon Davis and India Williams, by and through their attorneys, respectfully pray for the following relief, individually and on behalf of the class, against Defendant Mayor de Blasio, in his individual and official capacity, and Defendant City of New York:

A.    An injunction requiring that each and every relevant class member residence be provided with reasonable means to maintain prescribed indoor temperatures during all seasons, without interruption;

B.    A rent abatement in the amount of 100% of each Plaintiff's, and each class member's, respective rent obligations;

C.    An award of actual damages in an amount to be proven at trial;

D.    An award of punitive damages;

E.    An award of reasonable attorneys' fees and costs;

F.    Such further and other relief as this Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues as to which a jury trial is available.

Respectfully Submitted,

BY:   s/ James P. Batson

*Attorney for Plaintiffs*

James P. Batson
Christopher V. Langone (*PRO HAC VICE*)
LANGONE, BATSON LLC
520 White Plains Road, Suite 500
Tarrytown, NY 10591
(312) 344-1945

Greg G. Gutzler
Justin S. Nematzadeh
DICELLO LEVITT GUTZLER LLC
444 Madison Avenue, 4th Floor
New York, New York 10022
(646) 933-1000

Antonio M. Romanucci (PRO HAC VICE)
David A. Neiman (PRO HAC VICE)
Bryce T. Hensley (PRO HAC VICE)
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, IL 60654
(312) 458-1000